Case No.16-6543

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

TERRENCE MILAM,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the Western District of Tennessee,
Western Division

_____

## APPELLANT'S PRINCIPAL BRIEF

_____

Doris Randle-Holt
Federal Public Defender
Needum L. Germany
Assistant Federal Defender
Court-Appointed Attorney for
Terrence Milam
200 Jefferson, Suite 200
Memphis, Tennessee 38103
(901) 544-3895

# TABLE OF CONTENTS

**Page**

Table of Authorities……………………………….....................................iii

Statement Regarding
Oral Argument…………………………………….....................................ix

Statement of Jurisdiction..........................................................................1

Statement of the Issues..............................................................................2

> **Issue I: Whether Mr. Milam's Sixth Amendment right to confront a witness was violated when the magistrate judge refused to allow a recording of inconsistent testimony to be used to refresh recollection and thereafter, to be entered in evidence.**
>
> **Issue II: Whether Mr. Milam's sentence is greater than necessary to achieve the sentencing goals set forth under 18 U.S.C. § 3553(a), creating unwarranted sentencing disparities among similarly situated offenders.**

Statement of the Case..............................................................................3

    Relevant Facts.....................................................................................3

    Relevant Procedural History..............................................................4

    Rulings Presented for Review..........................................................20

Summary of Arguments..........................................................................21

Arguments................................................................................................23

Conclusion................................................................................................41

Certificate of Compliance.......................................................................42

Designation of District Court Documents..............................................43

Certificate of Service...................................................................................45

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u><span style="float:right"><u>Page</u></span>

<u>Gall v. United States</u>,
552 U.S. 38 (2007)...................................................................................32

<u>Davis v. Alaska</u>,
415 U.S. 308 (1974)..................................................................................23

<u>Delaware v. Van Arsdall</u>,
475 U.S. 673 (1986)..................................................................23-24, 29-30

<u>Hardy v. Rivard</u>, No. 16-1133,
2016 U.S. App. LEXIS 15766
(6th Cir. Aug. 18, 2016)............................................................................30

<u>Illinois v. Caballes</u>,
543 U.S. 405 (2005)..................................................................................25

<u>Illinois v. Wardlow</u>,
528 U.S. 119 (2000)..................................................................................27

<u>North Carolina v. Alford</u>,
400 U.S. 25 (1970)......................................................................................4

<u>Terry v. Ohio</u>,
392 U.S. 1 (1968)................................................................................26-28

<u>United States v. Avery</u>,
137 F.3d 343 (6th Cir. 1997).....................................................................25

<u>United States v. Cochrane</u>,
702 F.3d 334 (6th Cir. 2012).....................................................................32

<u>United States v. Conatser</u>,
514 F.3d 508 (6th Cir. 2008).....................................................................39

<u>United States v. Crousore</u>,
1 F. 3d 382 (1993)....................................................................................28

United States v. Grant,
920 F.2d 376 (6th Cir. 1990)......................................................................26

United States v. Gross,
662 F.3d 393 (6th Cir. 2011)................................................................12, 27

United States v. Holden,
557 F.3d 698 (6th Cir. 2009).........................................................23-24, 29

United States v. Irey
612 F.3d 1160 (11th Cir. 2010).............................................................34-35

United States v. Kathman,
490 F.3d 520 (6th Cir. 2007)......................................................................32

United States v. Kinney, No. 15-3796,
2016 U.S. App. LEXIS 15006
(3d Cir. Aug. 16, 2016)..............................................................................37

United States v. Martin,
920 F.2d 393, 397 (6th Cir. 1990)..............................................................24

United States v. Molina,
530 F.3d 326 (5th Cir. 2008)......................................................................35

United States v. Obiukwu,
17 F.3d 816 (6th Cir. 1994)........................................................................23

United States v. Peters,
194 F.3d 692 (6th Cir. 1999)................................................................25-26

United States v. Rappy,
157 F.2d 964 (2d Cir. 1947)........................................................................24

United States v. Ratigan,
581 F. App'x 587 (8th Cir. 2014)...............................................................38

United States v. Saperstein,
723 F.2d 1221 (6th Cir. 1983)....................................................................26

United States v. See,
574 F.3d 309 (6th Cir. 2009)..........................................................12, 26-27

United States v. Shea,
493 F. App'x 792 (7th Cir. 2012)..........................................................38-39

United States v. Shoupe,
548 F.2d 636 (6th Cir. 1977)..........................................................24

United States v. Stepp,
680 F.3d 651 (6th Cir. 2012)..........................................................29-30

United States v. Vowell,
516 F.3d 503 (6th Cir. 2008)..........................................................33

United States v. Waldon,
206 F.3d 597 (6th Cir. 2000)..........................................................25-26

United States v. Walls,
546 F.3d 728 (6th Cir. 2008)..........................................................32

United States v. Weller,
238 F.3d 1215 (10th Cir. 2001)..........................................................24

Wong Sun v. United States,
371 U.S. 471 (1963)..........................................................28

**Statutory Authority**

U.S. Const. amend. VI..........................................................23

18 U.S.C. § 2..........................................................1, 4

18 U.S.C. § 2251(a)..........................................................1, 4, 39

18 U.S.C. § 2251(e)..........................................................1, 4

18 U.S.C. § 2252(a)(4)(B)..........................................................1, 4

18 U.S.C. § 2253..........................................................1

18 U.S.C. § 3553(a)....................................................................passim

28 U.S.C. § 1291..............................................................................1

Fed. R. Evid. 104(a)........................................................................29

Fed. R. Evid. 1101(d)(1)..................................................................29

## **Other Sources**

Cassia Spohn, <u>Racial Disparities In Prosecution,
Sentencing, And Punishment</u>, in <u>The Oxford
Handbook of Ethnicity, Crime, and Immigration</u>
(S. Bucerius, et al., ed. 2013).......................................................36

Dept. of Justice, Bureau of Justice Statistics,
E.A. Carson, Ph.D., <u>Prisoners in 2014</u> (Sept. 2015)[1].......................36

Eric G. Holder, Attorney General, Remarks at
Annual Meeting of the American Bar Association's
House of Delegates (Aug. 12, 2013)[2]...........................................37

Michael Tonry, <u>Punishing Race:
A Continuing American Dilemma</u> (2011)..........................................36

U.S. Sentencing Comm'n,
<u>2012 Report to the Congress:
Fed. Child Pornography Offenses</u>[3]..............................................34

---

[1] <u>Available at</u>: http://www.bjs.gov/content/pub/pdf/p14.pdf

[2] <u>Available at</u>: http://www.justice.gov/iso/opa/ag/speeches/2013/ag-speech-130812.html

[3] <u>Available at</u>:

http://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Chapter_09.pdf

U.S. Sentencing Comm'n,
2015 Sourcebook of Fed.
Sentencing Statistics, Table 13[4].................................................................34

U.S. Sentencing Comm'n,
Life Sentences in the Federal
System (Feb. 2015)[5].................................................................36-37

U.S. Sentencing Comm'n, Report on the
Continuing Impact of United States v. Booker
on Federal Sentencing (Dec. 2012)[6].................................................................36

Vera Institute of Justice, B. Kutateladze &
N. Andiloro, Prosecution and Racial Justice
in New York County (Jan. 14, 2014)[7].................................................................36

---

[4] Available at: http://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2015/Table13.pdf

[5] Available at:

http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/20150226_Life_Sentences.pdf

[6] Available at: http://www.ussc.gov/research/congressional-reports/2012-report-congress-continuing-impact-united-states-v-booker-federal-sentencing

[7] Available at:

http://www.vera.org/sites/default/files/resources/downloads/race-and-prosecution-manhattan-technical.pdf

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Comes now, Terrence Milam, by and through his appointed counsel, Needum L. Germany, pursuant to Sixth Circuit Rule 34(a)(1), and states that oral argument need not be presented.  The facts and legal arguments are adequately presented in the ensuing Brief and record, and the decisional process would not be significantly aided by oral argument at this time.

## STATEMENT OF JURISDICTION

The district court had jurisdiction in this case pursuant to 18 U.S.C. § 3231, as Mr. Milam was indicted by a federal grand jury on or about April 9, 2015, for alleged violation of 18 U.S.C. §§ 2, 2251(a),(e), 2252(a)(4)(B), and 2253. (Indictment, R. 2, Page ID # ('PID#') 7-12.)

The Sixth Circuit Court of Appeals has jurisdiction to hear the present appeal pursuant to 28 U.S.C. § 1291. Mr. Milam filed a notice of appeal on October 13, 2016, from the judgment in a criminal case docketed October 7, 2016. (Redacted J., R. 84, PID# 549-554; Notice of Appeal, R. 85, PID# 555.)

## <u>STATEMENT OF THE ISSUES</u>

<u>Issue I</u>: Whether Mr. Milam's Sixth Amendment right to confront a witness was violated when the magistrate judge refused to allow a recording of inconsistent testimony to be used to refresh recollection and thereafter, to be entered in evidence.

<u>Issue II</u>: Whether Mr. Milam's sentence is greater than necessary to achieve the sentencing goals set forth under 18 U.S.C. § 3553(a), creating unwarranted sentencing disparities among similarly situated offenders.

## STATEMENT OF THE CASE

### Facts Relevant to Issues Submitted

On the evening of January 21, 2015, Memphis Police Department Officer Zachery Apel was patrolling his assigned area in his squad car when he noted a black Tahoe backed in behind one of the portable classrooms at Knight Road Elementary School. (Suppression Hr'g Tr. ("SuppHT"), R. 46, PID# 92-94.) There was nothing going on at the school and the Tahoe was the only vehicle in the lot. Id. at PID# 99-100. Officer Apel had also seen unspecified inappropriate things going on in this area before. Id. at PID# 94. He pulled in front of the Tahoe and turned on his spot light. Id. at PID# 101. He observed Mr. Milam with a young female, later identified das M.R., in the vehicle. Id. at PID# 94. He eventually suspected there was improper sexual contact occurring between Mr. Milam and M.R. Id. at PID# 95. Officer Apel removed Mr. Milam from the vehicle and detained him in his squad car. Id. Mr. Milam was eventually arrested and the M.R., who was interviewed later, reported improper sexual contact. (SEALED Presentence Report ("PSR"), R. 76, PID# 410-11.) It was later found that Mr. Milam also molested M.R.'s sister, T.R. Id. Both girls viewed Mr. Milam as their father. Id. at PID# 411.

3

**Relevant Procedural History**

    **A.**      **Introduction: Procedural posture of the case on appeal.**

A federal grand jury in the Western District of Tennessee returned an indictment charging Mr. Milam with six counts that included five counts of attempted sexual exploitation of a minor and sexual exploitation of a minor, and one count of possession of child pornography, in violation of 18 U.S.C. §§ 2, 2251(a), (e), and 2252(a)(4)(B). (Indictment, R. 2, PID# Page ID # 7-11.) Mr. Milam filed a pretrial motion to suppress. (See Mot. Suppress, R. 36, PID# 66-69.) His argument was that the investigative detention of his vehicle was not supported by reasonable suspicion. Id. This motion was denied. (See Order Adopting R & R, R. 57, PID# 196-211.)

Mr. Milam proceeded to trial, but after preliminary matters were addressed, he elected to enter an Alford plea.[8] Mr. Milam reserved his right to appeal the district court's denial of his motion to suppress. (See Minutes: Change of Plea Hr'g, R. 68; see also SEALED Sentencing Hr'g Tr. ("SSHT"), R. 87, PID# 598.) Mr. Milam also appeals his 2,040 month sentence. (SSHT, R. 87, PID# 599.)

---

[8] North Carolina v. Alford, 400 U.S. 25 (1970) (holding there are there are no constitutional barriers in place to prevent a judge from accepting a guilty plea from a defendant who wants to plead guilty while still protesting his innocence).

**B.**     **Procedural history as relevant to the suppression issue.**

**1.     Officer Apel's testimony at the State preliminary hearing.**

Mr. Milam was charged with violation of State law, and his preliminary hearing for his State charges was held in June 2015.  (SuppHT, R. 46, PID# 107.) At that hearing, Officer Apel testified for the State, explaining that he pulled directly in front of the Tahoe, cutting it off, and then activated his spotlight.  (Exh. & Witness List, Def. Exh. 3, R. 45, PID# 86.[9])  He also testified about what he saw in the Tahoe, and his subsequent investigation, as follows:

> I went up to investigate the vehicle, shined my spotlight inside, and I saw Defendant Milam and a little girl in the front seat.  As I was exiting my squad car, I noticed that they were wiggling around, looked to me like they were trying to pull their pants up.  And at that time, I approached the driver.

Id.; (see also Report and Recommendation ("R & R"), R. 49, PID# 166.)  Officer Apel similarly testified on cross-examination that he cut the Tahoe off and then shone his spotlight inside.  (Exh. & Witness List, Def. Exh. 3, R. 45, PID# 86.)  He then said:

> At that point, I see the defendant here and the little girl appear to be pulling up their pants.  They were doing a wiggling motion which was indicative of them pulling up their pants.  At that point I exited the vehicle.

Id.

---

[9] Four copies of Defense Exhibit 3, the DVD containing the audio of the preliminary hearing, are being supplied to the Court under separate cover.

## 2.    Mr. Milam's federal suppression hearing.

The suppression hearing on Mr. Milam's motion to suppress was held in February 2016.  (SuppHT, R. 46, PID# 87.)  At this hearing, Officer Apel again testified that he stopped directly in front of the Tahoe on the evening in question.  Id. at PID# 106.  He testified there would have been no way for the Tahoe to pull forward, or back out.  Id.  In fact, Officer Apel again said that he cut the Tahoe off with his vehicle.  Id. at PID# 122.  Unlike his direct testimony in the State preliminary hearing, however, he testified that he pulled up to the Tahoe with his spotlight on and was immediately able to see the individuals inside struggling to put on their pants.  Id. at PID# 106-07, 123.

On cross examination, the defense asked Officer Apel if he recalled testifying during the State preliminary hearing in June 2015, which would have been closer to the actual incident than the federal suppression hearing.  Id. at PID# 107.  Officer Apel responded that he believed so.  Id.  The defense then asked Officer Apel if his testimony differed in the State preliminary hearing in that he had testified on direct there that it was not until he was exiting his vehicle that he saw the Tahoe's occupants jostling around.  Id. at PID# 107-08.  Officer Apel replied that he did not believe that his testimony differed.  Id. at PID# 108.

The defense asked for permission to play a recording of the preliminary hearing.  Id. at PID# 108.  The prosecution replied that it had not yet heard the

6

preliminary hearing transcript.  Id.  The prosecution also averred that it was an inappropriate method of impeachment -- that Officer Apel should be shown what was being offered and asked to acknowledge whether or not it was the same.  Id. The magistrate judge asked whether the defense had a copy of the transcript for the State preliminary hearing, and the defense replied that it did not.  Id. at PID# 108-09.  The court observed that submission of a transcript was the usual method of refreshing recollection.  Id. at PID# 109.

The defense responded that the officer had testified that he did not believe that his testimony differed in the State preliminary hearing.  Id.  Thus, the defense wanted to let the officer hear his testimony and explain it, as a means of impeachment.  Id.

The prosecution agreed that the officer could be given the opportunity to listen to his testimony, but that the testimony should not come in as evidence.  Id.  The defense responded that the recording was not being offered in evidence at that point. Id.  The prosecution responded that if it was played, it would become a part of the hearing, and continued its objection to playing the recording.  Id. at PID# 109-110.

The magistrate judge stated that this was the first time she had anyone try to impeach a prior statement without use of a transcript.  Id. at PID# 110.  The magistrate offered a solution to her own dilemma by stating that the defense could play it as an offer of proof and that it would come in under the category of "what it's worth" when she drafted her R & R.  Id. at PID# 110-11.  The defense responded

7

that a recording of prior testimony should be permitted during the suppression hearing. Id. at PID# 111.

The prosecution reasserted its objection, stating that it would be different if the officer had an opportunity to listen to his prior testimony privately before responding, but it would be inappropriate to make it part of the record. Id. The defense argued that it was not required to give the officer notice of the evidence with which it was planning to impeach. Id.

The magistrate judge tried to clarify, noting that there was no disagreement regarding whether the defense could impeach, it was the method of impeachment. Id. The magistrate judge said there would be no issue if there was a transcript because the officer would have an opportunity to review the transcript testimony, hand it back, and then say whether it refreshed his recollection. Id. at PID# 111-12. If he said that the testimony did not refresh his recollection, then the testimony could be published. Id. at PID# 112.

Defense counsel replied that Officer Apel could identify his own voice from listening to the audio of the preliminary hearing and then listen to it, just as if he were reading a transcript, in order to determine whether his recollection was refreshed in the same manner. Id. The magistrate judge made a distinction, however, stating that when a transcript is handed to a witness, she would not see or hear it. Id. The defense inquired why this would prejudice the Government because

8

the court would eventually be able to read the transcript, as well.  Id.  The court countered that this was not necessarily so, because if the witness said that it refreshed his recollection, it would never come into evidence.  Id.

The defense again moved to put the recording of the State preliminary hearing testimony in evidence.  Id.  The magistrate judge first said that she could not "unhear" it.  Id.  She then suggested a recess so that the officer could listen to his preliminary hearing testimony to determine whether it refreshed his recollection, and then resume proceedings.  Id.  The defense replied that this was unnecessary, but acceded to the court's wishes.  Id. at PID# 113.  The recess was taken.  Id.

When the magistrate judge took the bench after the recess, she asked whether the recording of the State preliminary hearing had refreshed Officer Apel's recollection and the defense responded that it had.  Id.

The defense then resumed cross examination, asking Officer Apel about the recording and whether he had earlier testified at the State preliminary hearing that it was not until he exited his squad car that he saw the Tahoe's occupants wiggling around.  Id. at PID# 114.  Officer Apel verified that this was his testimony in the State proceedings.  Id.  The defense then asked him whether anything had changed with regard to his testimony at the suppression hearing now that he had listened to his prior inconsistent testimony.  Id. at PID# 115.  Officer Apel replied that he did see the wiggling when he was exiting his vehicle.  Id.  Officer Apel went on to testify,

however, that his testimony in the State proceeding was general, while the questioning was more detailed in the federal hearing. Id. at 115-16. He testified that he actually was still in motion when he turned his spotlight on the Tahoe and he saw the occupants wiggling then, before stopping and exiting his vehicle. Id. at PID# 117.

At that point, the defense requested the court to hear the recording of the testimony from the State preliminary hearing. Id. at PID# 118. The prosecution objected, noting that the officer had testified that his testimony was different between the two proceedings, and that was impeachment. Id. The defense responded by asserting that the officer also said his answers were different because the questions were asked differently, and so the audio should be heard. Id.

The magistrate judge interjected, observing that the evidence was the testimony, not the questions. Id. The magistrate also noted that the officer was asked generally what he saw in the earlier State proceedings, while he was asked in federal court to go through the events step by step. Id.

The defense disagreed that the questions were different between the two proceedings. Id. The defense reiterated that, in order to understand the gravity of the testimony, it was incumbent upon the court to listen to the recording. Id. at PID#

10

119.  The magistrate judge responded by inferring[10] that the evidence was not properly before her.  Id.  The defense pointed out that the Rules of Evidence were relaxed at suppression hearings and did not apply.  Id.  The magistrate responded that she would consider it "for what it's worth."  Id. at PID# 119.

The prosecution then made another objection that the recording would not be part of the record because it would not be transcribed for the hearing.  Id. at PID# 120.  The prosecution pointed out that if the court was going to listen to the recording, it needed to be a part of the record.  Id.

The magistrate judge then directed the defense to make a copy of the recording available to the court.  Id. at PID# 120.  The defense made a motion to put the copy of the recording in evidence so that the court could listen to it.  Id. at PID# 121.  The court never ruled upon whether the recording was actually in evidence.  Id. at 121-22.

When argument was permitted, the defense averred that the narrow issue in the case was that when an individual is blocked in by a police vehicle before the police actually observe anything reasonably suspicious, it constitutes a Fourth

---

[10] The judge began with the statement: "It's how -- it's how do we impeach, right, and how you get it in front of me."  Id. at PID# 119.  This was followed by the beginnings of a discussion on the rules of evidence and criminal procedure that the judge did not finish because it was here that the defense interjected that the rules of evidence do not apply at suppression hearings.  Id.  This is why the word "inferring" is used here.

11

Amendment violation and all subsequent evidence must be suppressed.  Id. at PID# 127-30 (citing United States v. See, 574 F.3d 309 (6th Cir. 2009); United States v. Gross, 662 F.3d 393 (6th Cir. 2011)).  The defense explained that this was why it was so critical in the case to hear the officer's discrepant testimony.  Id.

The magistrate judge then asked defense counsel to provide the recording on disc, and to specify the timeline of the disc where the court was to listen.  Id. at PID# 130-33.  She said that she would make note in her R & R of how she treated the recording.  Id. at PID# 131.  The magistrate judge also permitted post-hearing briefing on the Fourth Amendment issue raised by the defense.  Id. at PID# 133.

### 3.    The defense's post-hearing briefing.

In its post-hearing memorandum, the defense discussed the admissibility of the recording of Officer Apel's testimony in the State preliminary hearing.  (Def.'s Post Hr'g Memo, R. 48, PID# 143-46.)  The defense pointed out that, despite the prosecutions objections to the recording and the court's instructions to the defense to identify only those portions of the recording upon which it rested its impeachment argument, the prosecution had used other parts of the recording to support its own arguments.  Id. at PID# 144.  The defense submitted that the court should review the entire recording.  Id.

The defense argued again that the rules of evidence are not applicable at suppression hearings.  Id. at PID# 145.  The defense also observed that the court had

admitted Officer Apel's notes in evidence, which was illustrative of the relaxed evidence rules.  Id. at PID# 145-46.

The remainder of the defense memo was directed to the substantive issue of whether Officer Apel blocked Mr. Milam's vehicle prior to forming reasonable suspicion that criminal activity was afoot.  Id. at PID# 146-155.  In response to the prosecution's reliance upon the later portion of the recording where Apel contradicted his testimony on direct by stating that he saw wriggling around as soon as he put his spotlight on the vehicle, the defense pointed out that Apel's State testimony still showed that he blocked the Tahoe prior to shining his spotlight on the vehicle.  Id. at PID# 149.

### 4.    The R & R.

When the magistrate judge issued the R & R, she never ruled on the admissibility of the recording.  (See Order Adopting R & R, R. 57, PID# 202.)  The magistrate judge did, however address those portions of the recording specifically identified by the defense, and the part relied upon by the prosecution for its arguments.  (R & R, R. 49, PID# 166.)  The magistrate judge found that any discrepancies in Officer Apel's testimony at the State preliminary hearing and the suppression hearing had been clarified by his testimony at the suppression hearing. Id. at PID# 169-70.  Finding Apel credible, the magistrate court found that Officer Apel's testimony supported a conclusion that he made his observations of suspicious

13

activity before he parked in front of Mr. Milam's Tahoe.  Id.  She recommended denial of the motion to suppress.  Id. at PID# 164, 174.

### 5.    Mr. Milam's objections to R & R.

In its objections to the R & R, the defense continued to assert that the entire recording of Officer Apel's State preliminary hearing testimony should have been admitted in evidence at the outset.  (Objections R & R, R. 50, PID# 173-74.)  The defense noted that the magistrate judge had never ruled that the recording would be entered into evidence, but she relied upon certain portions for her R & R.  Id.  The defense requested a de novo hearing in order to permit proper cross examination of Officer Apel, which would aid the court in assessing his credibility.  Id. at PID# 174. The remainder of the defense's objections to the R & R went to the substantive issue of whether Officer Apel blocked the Tahoe prior to forming a reasonable suspicion that criminal activity was afoot based upon the only testimony that had been permitted in the case.  Id. at PID# 175-181.

### 6.    Order Adopting R & R.

The district court denied the defense's request for a de novo hearing, overruled the defense's objections, adopted the R & R, and denied Mr. Milam's motion to suppress.  (Order Adopting R & R, R. 57, PID# 197.)  The district court noted that Mr. Milam was forbidden from playing audio recording in open court or having it admitted into evidence by the magistrate judge.  Id. at PID# 205.  The district court

14

also noted that Officer Apel's credibility was material to the motion to suppress, and the prosecution had not argued that it would be prejudiced by a de novo hearing.  Id.

Nonetheless, the district court also found that Mr. Milam had not shown that a de novo hearing would change the court's ruling on the motion to suppress.  Id. The district court reasoned that the defense was given the opportunity to question Officer Apel about his preliminary hearing testimony, and he had admitted that his testimony was different.  Id.  The district court also noted that all agreed that Officer Apel had been impeached.  Id.  Further, the district court observed that the magistrate judge had listened to Officer Apel's preliminary hearing testimony and took it into consideration, as the defense requested.  Id. at PID# 205-06.  The district court framed it as a credibility issue, and found no reason to question the magistrate's determination that Officer Apel had clarified any discrepancies between his two testimonies.  Id. at PID# 206.  Thus, the district court could not see how further questioning would diminish the credibility determination.  Id.

### C.    Procedural history as relevant to the sentencing issue.

As in all criminal cases, a PSR was prepared for use at Mr. Milam's sentencing.  Mr. Milam's total offense level was 43, and his criminal history category was 5.  (PSR, R. 76, PID# 418, 433-34.)  With a total offense level of 43, and a criminal history category of V, the Guidelines imprisonment range was life. Id. at PID# 444.  The statutorily authorized maximum sentences applicable to his

charges, however, were less than the applicable Guidelines range. Thus, the Guidelines range was limited to 2,040 months. Id.

At Mr. Milam's sentencing hearing, the defense first acknowledged the dreadful nature of Mr. Milam's crimes. (SSHT, R. 87, PID# 570.) The defense also informed the district court that, with his State action still pending, Mr. Milam was somewhat restricted in expressing his remorse at the federal sentencing, but he was remorseful. Id. at PID# 570-71. The defense pointed out that by pleading guilty, Mr. Milam did spare his victims from testifying at trial. Id. at PID# 570.

The defense also asked the court to consider that, though not an excuse, Mr. Milam had himself suffered the same type of abuse as a child. Id. at PID# 571-72. The defense asked for the court to take this into consideration as one mitigating factor. Id.

The defense then observed that a 2,040 month sentence was essentially a life sentence without the possibility of parole. Id. at PID# 571-72. The defense posited that this was greater than necessary to achieve just punishment in the case, and asked the court to consider a sentence with a least the possibility of release from prison at some point. Id. The defense also offered several certificates as evidence of the efforts Mr. Milam was already attempting to make to better himself while in jail awaiting his sentencing. Id. at PID# 576-77. The defense requested the court take these rehabilitative efforts into consideration when fashioning the sentence. Id. at

16

PID# 577. The defense requested a below-Guidelines sentence. Id. at PID# 572, 577.

The court began its sentencing analysis by noting that Mr. Milam was not technically receiving a life sentence, though it was doubtful that he would live 170 years. Id. at PID# 578. The court also noted the statutory mandatory minimum was 75 years (i.e., 5 counts with mandatory minimum sentences of 15 years each). Because Mr. Milam was 37 years old at his sentencing, the district court judge stated that Mr. Milam would basically get life as a practical matter even with the mandatory minimum sentence. Id. at PID# 578.

The district court judge then noted that he had once sentenced a contract killer to a three-hundred year sentence, which was the mandatory sentence in that case, and asked the prosecutor why Mr. Milam's case deserved a 170-year sentence, as opposed to a 100-year sentence. Id. at PID# 579. The prosecutor responded that a 100-year sentence would make a mockery of the Guidelines. Id. The court disagreed, noting that because § 3553(a) counsels courts to impose sentences that are not greater than necessary to comply with sentencing purposes, sometimes even sentences far below the Guidelines would not make a mockery of them. Id. The district court judge also stated that though the Guidelines often presented a specious objectivity, he found comfort in them because they represented what Congress generally wanted. Id. at PID# 580.

17

The Government then shifted gears and stated that the sentence was justified because Mr. Milam's behavior was ongoing and regular.  Id. The Government pointed out that the victims were exceedingly young (approximate ages between 10 and 13) and they would suffer a lifetime of harm.  Id. at PID# 581, 584.

The court then went through its sentencing analysis.  The court noted that the crimes were serious, horrific and unfathomable.  Id. at PID# 584.  The court viewed the case as more serious because Mr. Milam was a father figure, who exploited that relationship for years.  Id.

The district court judge did note that it was not the worst case of sexual exploitation he had ever seen, observing that he had previously sentenced fathers, uncles and grandfathers for the same crime.  Id. at PID# 585.  The judge then negated this first statement and said that he had not seen a case worse than Mr. Milam's, given the age of the children.  Id.

The court assumed Mr. Milam was remorseful, but stated that all of the apologizing in the world could not make up for what he had done.  Id. at PID# 585-86.  The court noted Mr. Milam's own abuse as a child, and though the court found that the abuse might explain the situation, it did not mitigate the crime.  Id. at PID# 586.

The court then went through the sentencing factors required under 18 U.S.C. § 3553(a)(2).  First, the court noted that there was a strong need to promote respect

for the law, as Mr. Milam appeared to have contempt for it given his criminal history and the nature of the offenses.  Id. at PID# 589.

The court also found a strong need for deterrence, to protect the children involved from Mr. Milam, as well as other children.  Id.  The court also wanted to send a strong deterrent message others and protect the public.  Id.

The court noted the fact that the Guidelines range exceeded the statutory maximum, and found both the Guidelines range and the statutory provisions reflected how seriously Congress took these types of crimes and their punishment. Id. at PID# 590.  Because of this, the district court hesitated in going below the Guidelines range because the sentence was already actually below the Guidelines range when the statutory maximum was imposed.  Id. at PID# 590-91.

The court noted that it had discretion to go down to 75 years, taking 95 years off the statutory maximum.  Id. at PID# 591.  The court thought this would be a mistake, however, because of the seriousness of the offense, the extreme nature of the conduct, the severity of the exploitation and the length of time it went on.  Id. The court concluded that the sentence needed to reflect the strongest possible general deterrence.  Id.

The court stated that the sentence needed to send a message to someone contemplating this type of crime that the consequences would be extremely serious.

19

Id.  The court believed that a lower sentence would not protect the public because it would not afford adequate deterrence to others.  Id. at PID# 591-92.

The court then stated that it was trying to avoid unwarranted sentencing disparities, and that the Guidelines' sentence in this case accomplished this goal.  Id. at PID# 592.  The court thus found that the 2,040 statutory maximum sentence was appropriate.  Id.

The defense observed that Mr. Milam's State charge carried a sentence of 25 years, not 25 years for each count.  Id. at PID# 593.  The district court rejected this argument because it was bound by federal law, not state law on the matter.  Id.  The defense nonetheless asked the court to consider imposing the statutory maximum sentence of 30 years for each of the sexual exploitation counts, but run them concurrent with one another.  Id. at PID# 394.  The court refused this request.  Id.

The court imposed a sentence of 360 months on each of the five sexual exploitation counts, and 240 months on the possession of child pornography count, for a total of 2,040 months imprisonment.  Id. at PID# 595; (see also redacted J., R. 84, PID# 551.)

**Rulings Presented for Review**

Mr. Milam appeals his conviction and sentence in the United States District Court for the Western District of Tennessee before the Honorable Samuel H. Mays. (See Redacted J., R. 84, PID# 549-554.)

20

## <u>SUMMARY OF ARGUMENTS</u>

**<u>Issue I</u>:**    The magistrate judge's determination prohibiting the defense from playing the recording of Officer Apel's testimony from the State preliminary hearing while cross-examining him violated Mr. Milam's Sixth Amendment right to confront the witness.  The suppression motion was decided based upon Officer Apel's testimony, and thus his credibility was determinative of the outcome of the motion.  The real injury came when the magistrate judge forbid Mr. Milam from playing the recording of Officer Apel's State preliminary hearing testimony, and instead recessed to allow him to listen outside of the court's presence before testifying.  This gave the officer more time than he would have otherwise had under normal cross-examination to develop testimony that would reconcile his inconsistent versions of the critical facts underlying the case.  Officer Apel's initial reaction to his inconsistent testimony can never be recaptured, and he now knows the critical testimony for the material issues in this case.  Hence, these aspects of a credibility evaluation are lost forever.  For this reason, Mr. Milam should have at least been given a de novo hearing so that he could rigorously explore the inconsistencies in the testimony so that it is ensured that the magistrate and/or district judge had enough information to assess the defense's theory of the case.

As it stands now, Mr. Milam was not able to effectively cross examine Officer Apel.  In fact, the preliminary hearing testimony was never even admitted into

evidence and the magistrate judge simply said she would consider it "for what it is worth." This injuriously affected the outcome of the case and is not harmless error. Mr. Milam therefore respectfully requests this Court to reverse his conviction and remand for further proceedings.

**Issue II:**    To be substantively reasonable, a sentence must be proportionate to the seriousness of the circumstances of the offense and offender, and sufficient but not greater than necessary, to comply with the purposes of 18 U.S.C. § 3553(a). Under 18 U.S.C. § 3553(a)(6), the sentencing court must consider the need to avoid unwarranted sentence disparities among similarly situated defendants. Though presumptively reasonable because it is within the Guidelines range, consecutive maximum sentences for each charge in Milam's case creates great disparity among similarly situated defendants. The sentence is far greater than necessary to comply with the sentencing purposes set forth in § 3553(a). Put simply, a 2,040 months sentence exceeds the bounds of reasonableness. Mr. Milam therefore respectfully requests this Court to reverse his sentence and remand for resentencing.

# ARGUMENTS

**ISSUE I:**    **MR. MILAM'S SIXTH AMENDMENT RIGHT TO CONFRONT A WITNESS WAS VIOLATED WHEN THE MAGISTRATE JUDGE REFUSED TO ALLOW A RECORDING OF INCONSISTENT TESTIMONY TO BE USED TO REFRESH RECOLLECTION AND THEREAFTER TO BE ENTERED IN EVIDENCE**

## Standard of Review

Limits on cross-examination are reviewed for abuse of discretion. United States v. Obiukwu, 17 F.3d 816, 821 (6th Cir. 1994). A violation of the Confrontation Clause is subject to a harmless error analysis. Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986).

## Argument

The Sixth Amendment provides a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. The magistrate judge's determination prohibiting the defense from playing the recording of Officer Apel's testimony from the State preliminary hearing while cross-examining him violated Mr. Milam's Sixth Amendment right to confront the witness.

"The Confrontation Clause of the Sixth Amendment guarantees a defendant an opportunity to impeach the credibility of a witness against him because impeachment is fundamental to effective cross-examination." United States v. Holden, 557 F.3d 698, 704 (6th Cir. 2009) (citing Davis v. Alaska, 415 U.S. 308, 315-18 (1974)). "[A] criminal defendant states a violation of the Confrontation

23

Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witness." Van Arsdall, 475 U.S. at 680 (internal quotations omitted). "The key issue is whether the jury had enough information to assess the defense's theory of the case despite the limits placed on cross-examination." Holden, 557 F.3d at 704.

Additionally, once it has been shown that a witness' memory is exhausted, "anything may be used to refresh a witness' recollection, even inadmissible evidence." United States v. Weller, 238 F.3d 1215, 1221 (10th Cir. 2001); United States v. Shoupe, 548 F.2d 636, 641 (6th Cir. 1977) (proper foundation requires the witness' recollection to be exhausted, and that the time, place and person to whom the statement was given be identified); United States v. Rappy, 157 F.2d 964, 967-68 (2d Cir. 1947) ("Anything may in fact revive a memory; a song, a scent, a photograph, and allusion, even a past statement known to be false."). Further, a witness may comment on a recorded conversation in his own words and indicate what was said and what occurred. United States v. Martin, 920 F.2d 393, 397 (6th Cir. 1990).

In this case, the problem came initially when the magistrate judge stated she was unfamiliar with the use of an actual audio recording of testimony, rather than

24

the transcript of the same, to refresh a witness' recollection. Once the magistrate judge prohibited the use of the recording in this manner, Mr. Milam's ability to confront the witness against him was severely impaired.

All agree that the critical issues in this case hinged upon whether Officer Apel was or was not blocking Mr. Milam's vehicle in and whether he formed reasonable suspicion that criminal activity was afoot before he exited his vehicle. The relevant substantive law surrounding these issues was briefed below, but for ease of review, will be summarized again here.

Police and citizens may have three types of permissible encounters: "(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause." United States v. Waldon, 206 F.3d 597, 602 (6th Cir. 2000) (quoting United States v. Avery, 137 F.3d 343, 352 (6th Cir. 1997)). Importantly for this case, "a seizure that is lawful at its inception can [still] violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." Illinois v. Caballes, 543 U.S. 405, 407 (2005) (citation omitted).

In a consensual encounter, law enforcement officers may ask citizens general questions without having any reasonable suspicion of criminal activity. United

States v. Peters, 194 F.3d 692, 698 (6th Cir. 1999).  Because law enforcement officials may approach individuals and propose initial questions without having any reasonable suspicion of criminal activity, if the police do nothing to convey to the defendant that he is not free to leave, the encounter does not become a seizure for Fourth Amendment purposes as long as the individual consents to questioning.  Id.

A consensual encounter can ripen into a seizure, however, if "in light of all of the circumstances, [] 'a reasonable person [would] have believed that he or she was not free to walk away.'"  United States v. Grant, 920 F.2d 376, 382 (6th Cir. 1990) (quoting United States v. Saperstein, 723 F.2d 1221, 1225 (6th Cir. 1983)).  "Whether an encounter between a police officer and a citizen is consensual depends on the officer's objective behavior, not on any subjective suspicion of criminal activity."  Waldon, 206 F.3d at 603.

In See, an officer was on patrol in a public-housing parking lot when he noticed a car that was backed into a parking space in a dimly lit area farther from the building than other vacant spots.  574 F.3d at 311.  The officer then pulled his patrol car in front of the parked car and parked so that the vehicle would not move.  Id. at 312.  This Court held that "the blocking of See's car to determine the identity of the occupants and maintain the status quo while obtaining this information was a warrantless Terry seizure[11] . . . [because] a reasonable person in See's position would

---

[11] Terry v. Ohio, 392 U.S. 1 (1968).

not have felt free to leave." Id. at 313 (citations and internal quotation marks omitted).

Thus, in this case, if it was shown that Officer Apel blocked Mr. Milam's car with his squad car, the finding would have to be that a reasonable person in Mr. Milam's position would not have felt free to leave. See, 574 F.3d at 313; Gross, 662 F.3d at 399. The analysis would proceed as if it were an investigative detention pursuant to Terry. Gross, 662 F.3d at 399 (blocking a parked car in begins an investigative Terry stop). This would require that Officer Apel be aware of specific and articulable facts that gave rise to reasonable suspicion before he could approach the vehicle. Illinois v. Wardlow, 528 U.S. 119, 124 (2000). An unparticularized suspicion or a hunch would not be sufficient. Gross, 662 F.3d at 399.

Admittedly, Officer Apel was doing his job when he drove over to check a lone vehicle parked in an empty school parking lot at night. In See, however, this circuit explained that an officer may not park his patrol car in front of a citizen's vehicle unless he suspects a specific crime. See, 574 F.3d at 314. An individual's presence in an area of suspected criminal activity and an odd time of day are relevant factors to an officer's calculus in the totality of circumstances, but they are not enough to support a reasonable, articulable suspicion that a person is committing a crime. Id. (citing Wardlow, 528 U.S. at 124). Under the defense's theory of the case, apart from the contextual factors of time and the status of the area, all that

27

Officer Apel knew when he blocked Mr. Milam in was that there was an errant car parked in the school's parking lot at night. Officer Apel did not have reasonable suspicion that criminal activity was occurring, and the Terry stop was therefore improper. Because the initial stop was unlawful, the evidence that resulted from the subsequent search should have been suppressed as the fruit of the poisonous tree. Wong Sun v. United States, 371 U.S. 471 (1963).

Given the law applicable to the case, Officer Apel's testimony regarding whether he blocked Mr. Milam in, and whether he had reasonable suspicion prior to exiting his squad car and approaching Mr. Milam's vehicle, were critical to this case. Taking a recess in the middle of cross-examination regarding these critical issues in the case gave Officer Apel ample time to devise a plausible explanation that would reconcile his prior testimony with the testimony he gave at the suppression hearing. This means Officer Apel's credibility was never adequately tested. Yet, his credibility became the determination upon which the lower courts both rested their decision to deny Mr. Milam's motion to suppress. And, it is axiomatic that credibility determinations will not be disturbed unless clearly erroneous. See, e.g., United States v. Crousore, 1 F. 3d 382, 386 (1993). Thus, once the initial erroneous determination to forbid playing the recording in order to refresh recollection was made, Mr. Milam essentially had no way to reverse the course of events through effective cross-examination.

28

The Federal Rules of Criminal Procedure explicitly provide that the Rules of Evidence do not apply when the district court is making a determination on the admissibility of evidence.  Fed. R. Evid. 104(a); <u>see also</u> Fed. R. Evid. 1101(d)(1) (deeming Rules of Evidence inapplicable when deciding fact issues relating to admissibility of evidence under Fed. R. Evid. 104(a)). The Rules of Evidence are inapplicable as well to the admission of evidence presented at suppression hearings. <u>United States v. Stepp</u>, 680 F.3d 651, 668 (6th Cir. 2012).

Of course, this does not mean that a defendant is free to impeach a witness "in whatever way, [or] to whatever extent the defense might wish."  <u>Holden</u>, 557 F.3d at 704 (quoting <u>Van Arsdall</u>, 475 U.S. at 679).  Rather, trial judges retain 'wide latitude" to impose "reasonable limits on cross-examination." <u>Id.</u> (quoting <u>Van Arsdall</u>, 475 U.S. at 679).  The key issue is whether the jury, or in this case, the magistrate judge, had enough information to assess the defense's theory of the case despite the limits placed on cross-examination.  <u>Id.</u> (citation omitted).

With specific regard to suppression hearings, a district judge has the discretion to place limits on a witness' testimony in order to facilitate the examination of the relevant evidence.  <u>See</u> <u>Stepp</u>, 680 F.3d at 668.  The very reason for suspending the Rules of Evidence in such hearings in the first place, however, is to allow the impartial judge, who is less prone to persuasion by misleading testimony than a jury, to weigh the competing evidence offered by the parties. <u>Id.</u> at 668-69 (citation

29

omitted).   At a suppression hearing, the district court is expected to err on the side of considering more, not less, information.  Id. at 669.

Rather than recognize her role as a more impartial arbiter of truth than a jury, the magistrate judge waivered with regard to her ability not to be influenced by what she heard on the preliminary hearing recording, stating that if it was played, she could not unhear it.  She thus did not err on the side of considering more evidence because she was admittedly unfamiliar with the concept of using an audio recording to refresh recollection.  In fact, the magistrate judge never ruled on admitting the recording in evidence.

The magistrate judge's decision had a substantial and injurious effect and influence in determining the outcome of this case, resulting in error that was not harmless.  See Hardy v. Rivard, No. 16-1133, 2016 U.S. App. LEXIS 15766, *3 (6th Cir. Aug. 18, 2016) (explaining that a violation of the Confrontation Clause will be considered harmless if it did not have a substantial and injurious effect or influence in determining the jury's verdict).  In making this determination, the reviewing court considers: (1) the importance of the witness's testimony to the prosecution's case; (2) whether the testimony was cumulative; (3) whether there is corroborating or contradictory evidence on material points; and (4) the strength of the prosecution's case.  Id. at *3-4 (citing Van Arsdall, 475 U.S. at 682).

All of these factors affirm that the error was not harmless.    First, even the district court judge recognized the importance of Officer Apel's testimony to the prosecution's case, stating that Officer Apel's credibility was material to the motion to suppress.    The testimony was certainly not cumulative, since he was the only witness.    Third, the main issue here is whether the preliminary hearing testimony corroborates or contradicts the material suppression points.    Finally, the prosecutions' case founders without Officer Apel's testimony.

In the end, the proverbial bell cannot now be unrung for Mr. Milam.    Officer Apel's genuine reaction to the defense's cross examination regarding the critical suppression issues will never be known because it could have only been observed by the magistrate judge when he first heard the preliminary hearing testimony. Without the recess wherein Officer Apel had the opportunity to formulate an explanation to reconcile his testimony, it will never be known what he may have said at the suppression hearing if the cross examination had simply proceeded apace. Because the decision on the motion to suppress turned on Officer Apel's credibility, Mr. Milam should have at least been granted a de novo hearing wherein he would have had an opportunity to strenuously cross examine the officer, rather than left with submission of the recording of the preliminary hearing testimony "for what it is worth."    This was not a harmless error, rather the outcome of the case was injuriously affected.

31

**ISSUE II:** **MR. MILAM'S SENTENCE IS FAR GREATER THAN NECESSARY TO ACHIEVE THE SENTENCING GOALS SET FORTH UNDER 18 U.S.C. § 3553(a) AND CREATES UNWARRANTED SENTENCING DISPARITIES AMONG SIMILARLY SITUATED OFFENDERS**

**Standard of Review**

The district court's sentence is reviewed for both procedural and substantive reasonableness under an abuse-of-discretion standard. Gall v. United States, 552 U.S. 38, 51 (2007). Mr. Milam's sentence cannot technically be challenged on procedural reasonableness grounds, and so the focus of his appellate argument is on its substantive reasonableness.

A sentence is substantively unreasonable if "the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." United States v. Kathman, 490 F.3d 520, 525 (6th Cir. 2007). An inquiry into whether a sentence is substantively reasonable focuses on whether a sentence is adequate, but not "greater than necessary" to fulfill the sentencing goals stated in 18 U.S.C. § 3553(a). United States v. Cochrane, 702 F.3d 334, 345 (6th Cir. 2012). A sentence that falls within a properly calculated advisory sentencing guidelines range is accorded a rebuttable presumption of reasonableness. See United States v. Walls, 546 F.3d 728, 736 (6th Cir. 2008).

## **Argument**

The 2,040 month sentence entered in this case is substantively unreasonable. It is far in excess of what is necessary to fulfill sentencing purposes (i.e., the need to: reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense; afford adequate deterrence; protect the public; and provide for Mr. Milam's rehabilitative needs).  See 18 U.S.C. § 3553(a)(2).  The district court technically assessed the appropriate sentencing factors when imposing the sentence.  Under 18 U.S.C. § 3553(a), however, the sentencing court must also consider the need to avoid unwarranted sentence disparities among similarly situated defendants.  18 U.S.C. § 3553(a)(6).  The district court's great focus on general deterrence and the need to send a message to others about these types of sexual exploitation crimes caused the court to lose sight of the sentencing disparity it was creating by imposing a 2,040 month sentence.

To be substantively reasonable, a sentence "must be proportionate to the seriousness of the circumstances of the offense and offender, and sufficient but not greater than necessary, to comply with the purposes of § 3553(a)."  See United States v. Vowell, 516 F.3d 503, 512 (6th Cir. 2008) (citation & internal quotation marks omitted).  Though presumptively reasonable because it is within the Guidelines range, imposing consecutive maximum sentences for each charge in Mr. Milam's case exceeds the bounds of reasonableness.

In 2015, the mean sentence for child pornography offenders was 153 months, while the median was 96 months. U.S. Sentencing Comm'n, 2015 Sourcebook of Fed. Sentencing Statistics, Table 13. The mean sentence for sexual abuse was 127 months, while the median was 120 months. Id. Granted, Mr. Milam's offenses are child pornography production offenses, and so the sentence is justifiably higher. See U.S. Sentencing Comm'n, 2012 Report to the Congress: Fed. Child Pornography Offenses, 253.

A search of federal caselaw nationwide shows vastly lower sentences for even the most egregious production behavior. For instance, in perhaps one of the most grotesque child pornography cases counsel has reviewed, the defendant traveled to Cambodia to rape and sodomize over 50 little girls, some as young as four, over a four- to five-year period. United States v. Irey 612 F.3d 1160, 1166-67 (11th Cir. 2010). He also tortured the children, some by placing cockroaches in the vaginal canal. Id. at 1167. He also scripted, cast, starred in, produced, and distributed worldwide some of the most graphic and disturbing child pornography that has ever turned up on the internet. Id. at 1167-68.

The horrific nature of the Irey defendant's crimes resulted in the same adjusted offense level that Mr. Milam was subjected to -- life imprisonment. Because the Government had charged all of the crimes in just one count, however, the statutory maximum was 30 years, which had the effect of reducing the Guidelines range to 30

34

years.  Id. at 1166.  The district court in that case varied even below this, but the Eleventh Circuit found this substantively unreasonable, remanding the case with instructions to impose the full 360-month sentence.  Id. at 1225.  Thus, because all of his terrible crimes were charged in only one count, the Irey defendant will only serve 30 years for atrocities that far outweigh what occurred in this case.

Admittedly, the types of sentencing disparities addressed under 18 U.S.C. § 3553(a), are not those founded upon prosecutorial discretion. As explained by the Fifth Circuit:

> The government has great discretion in deciding whether, and which offenses, to prosecute . . . . As a general rule . . . substantial deference is accorded decisions requiring the exercise of prosecutorial discretion, and those decisions are not subject to judicial review absent a showing of actual vindictiveness or an equal protection violation.  We allow the government discretion to decide which individuals to prosecute, which offenses to charge, and what measure of punishment to seek.

United States v. Molina, 530 F.3d 326, 332 (5th Cir. 2008).  Yet, the practical reality is that prosecutorial discretion does result in sometimes incredible disparities -- as illustrated by Mr. Irey's acts and his sentence, versus Mr. Milam's acts and his sentence.

Perhaps Mr. Milam's race played a part here.  Studies have indeed shown that, controlling for legally relevant differences, black defendants are more likely to be confined before trial, more likely to be sentenced to prison when non-prison sentences are available, and more likely to receive longer sentences than their white

counterparts.  See Michael Tonry, Punishing Race: A Continuing American Dilemma 70-76 (2011); Cassia Spohn, Racial Disparities In Prosecution, Sentencing, And Punishment 166-93, in The Oxford Handbook of Ethnicity, Crime, and Immigration (S. Bucerius, et al., ed. 2013).  Findings in a relatively recent study of the New York County District Attorney's Office by the highly-regarded Vera Institute of Justice exemplify these nationwide realities: it concluded that racial disparities manifested in nearly every identifiable point of "significant prosecutorial discretion." See Vera Institute of Justice, B. Kutateladze & N. Andiloro, Prosecution and Racial Justice in New York County 217 (Jan. 14, 2014) ("Vera Institute Study").  As a result, black male offenders receive sentences 20 percent longer than those imposed on white males convicted of similar crimes.  U.S. Sentencing Comm'n, Report on the Continuing Impact of United States v. Booker on Federal Sentencing 108 (Dec. 2012).  In 2014, 6 percent of all black men ages 30 to 39 were in prison, compared to 2 percent of Hispanics, and 1 percent of whites.   Dept. of Justice, Bureau of Justice Statistics, E.A. Carson, Ph.D., Prisoners in 2014, at 1 (Sept. 2015).  At year-end 2014, imprisonment rates for black males were 3.8 to 10.5 times greater at each age group than white males, and 1.4 to 3.1 times greater than rates for Hispanic males.  Id. at 15.   And, in fiscal year 2013, blacks received the highest percentage of the de facto life sentences -- the sentence Mr. Milam received here. U.S. Sentencing Comm'n, Life Sentences in the Federal System, 11 (Feb. 2015).

It is true that in 2014, the highest average sentences tended to go to child pornography offenders at 832 months, but these were rare, accounting for just 2.9 percent of all child pornography cases. Id. at 11-12. And, this is still 1,208 months below Mr. Milam's sentence. The problem is that "once they're in [the] system, people of color often face harsher punishments than their peers. Eric G. Holder, Attorney General, Remarks at Annual Meeting of the American Bar Association's House of Delegates (Aug. 12, 2013). As Attorney General Holder stated, "[t]his isn't just unacceptable — it is shameful[,] unworthy of our great country, and our great legal tradition." Id.

And there are further examples in the caselaw. In United States v. Kinney, No. 15-3796, 2016 U.S. App. LEXIS 15006 (3d Cir. Aug. 16, 2016), the defendant pled guilty to two counts of child pornography under 18 U.S.C. § 2251(a) for photographing himself raping eight- and six-year-old girls, who were entrusted to his care. See 2016 U.S. App. LEXIS 15006, at *2. Like Mr. Milam, his Guidelines recommendation was life, but his statutory maximum sentence was limited to 60 years. Id. Though the Government argued, much like Mr. Milam's case, that the defendant had ruined the girls' lives, the district court nonetheless imposed a 30-year sentence that was upheld by the Third Circuit, in light of the defendant's age, the opportunity for rehabilitation, the need to protect society, the need to impose a just sentence, and the need to reflect the seriousness of his crime. Id. at *3.

United States v. Ratigan, 581 F. App'x 587 (8th Cir. 2014), involved a Catholic priest defendant who pled guilty to four counts of production of child pornography, and one count of attempted production of child pornography. Between 2005 and 2009, the defendant took pictures of: (1) his six-year-old niece's vaginal area and pictures of her naked from the waist down; (2) several similar pictures of a Jane Doe, whom he started taking pictures of at age 2; (3) similar pictures of a five-year-old relative; and (4) two more sets of similar pictures of Jane Does, ages seven and eight. Rattigan, 581 F. App'x at 589. Like Mr. Milam, the defendant's Guidelines range was life, and the statutory maximum for each count was thirty years. Id. at 590. The district court even made findings that the priest had abused his authority in an offensive and incomprehensible manner by befriending the children and their families in order to satisfy his sexual desires. Id. at 591. Indeed, the second Jane Doe's parents testified about how the priest had destroyed their daughter's sense of safety, and how she would have to deal with the images throughout her life. Id. 590-91. Yet, the district court still only imposed a 50-year sentence, which was upheld by the Eighth Circuit. Id.

In United States v. Shea, 493 F. App'x 792 (7th Cir. 2012), the defendant captured live webcam images of girls as young as 13 exposing their breasts, and after using on-line resources to identify the girls, blackmailed them with threats to send the images to family and friends unless they sent him sexually explicit photos or

performed sexually explicit acts in front of a webcam. The defendant's commands were often sadistic. For instance, the defendant ordered one of the 15-year-old victims to physically abuse her friend for his gratification. See 493 F. App'x at 796.

Finally, one of his 16-year-old victims alerted authorities and the defendant was charged with four counts of sexually exploiting her under 18 U.S.C. § 2251(a). Almost unbelievably, when released on pretrial bond, the defendant did not stop. He did the same thing to four more teens and was charged by information with three additional counts. In all, the defendant victimized 10 minor girls in 8 states, more than a dozen young women, as well, and he was found to possess a collection of child pornography involving prepubescent children.

The Shea defendant's Guidelines range was life imprisonment. The district court sentenced him, however, to 396 months. Shea, 493 F. App'x at 794. This sentence reflected four concurrent 360-month sentences for the original four counts, and then consecutive 12-month sentences for the girls abused while the defendant was on pretrial release. Id.

These caselaw examples are given because, when analyzing claims about inordinately disparate sentences, this Circuit examines national disparities between defendants with similar criminal histories convicted of similar criminal. See United States v. Conatser, 514 F.3d 508, 521 (6th Cir. 2008). The judge here said that he had not seen a case of sexual exploitation of children that was worse than this case.

These cases illustrate there are cases far worse where the defendants receive far lighter sentences.

The district court judge here found a strong need to impose a lengthy sentence to send a message of deterrence to Mr. Milam and others who might be contemplating this type of crime. This is a valid consideration, but the sentence imposed is overkill for this purpose. Mr. Milam was 37 years old when sentenced, and even if one 360-month statutory maximum sentence had been imposed, he would be well on toward being a 70-year-old man once released from prison.

Whatever the reason for the imposition of the 2,040 month sentence here, it is far higher than necessary to achieve sentencing purposes. It is disparate from other sentences imposed upon similar defendants for the same, and often far worse, crimes. It surely must be unreasonable for the district court to simply state that the Guidelines accomplished the sentencing goal of avoiding disparities here. This sentence is substantively unreasonable and in error. Mr. Milam therefore respectfully requests that this Court reverse his sentence and remand for resentencing.

## **<u>CONCLUSION</u>**

Based on the foregoing, Mr. Milam, respectfully requests that this Court reverse his conviction and remand for further proceedings. Alternatively, Mr. Milam respectfully requests the Court to vacate his sentence and remand for resentencing because the sentence is substantively unreasonable.

Respectfully submitted,

<u>*/s/* Needum L. Germany</u>
Needum L. Germany
Assistant Federal Defender
200 Jefferson, Suite 200
Memphis, Tennessee 38103
(901) 544-3895

41

# CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

<u>x</u>    this brief contains <u>9,467</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

_    this brief uses a monospaced typeface and contains [state the number of ] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

<u>x</u>    this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Times New Roman font, or

_    this brief has been prepared in a monospaced typeface using _____ with _____.

<u>*/s/* Needum L. Germany</u>
Assistant Federal Defender
Dated: <u>November 29, 2016</u>

42

CASE NO. 16-6543

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

        Plaintiff/Appellee,

vs.

TERRENCE MILAM

        Defendant/Appellant.

---

## APPELLANT'S DESIGNATION OF
## RELEVANT DISTRICT COURT DOCUMENTS

---

Terrence Milam, Appellant, pursuant to Sixth Circuit Rule 30(g), hereby designates the following district court documents:

| DESCRIPTION OF ENTRY | DOCKET ENTRY NO. | PAGE ID# RANGE |
|---|---|---|
| Indictment | 2 | 7-12 |
| Mot. Suppress | 36 | 66-69 |
| Exh. & Witness List | 45 | 86 |
| Suppression Hr'g Tr. | 46 | 87-135 |
| Def.'s Post Hr'g Memo | 48 | 143-155 |

| | | |
|---|---|---|
| R & R | 49 | 164-171 |
| Objections R & R | 50 | 172-181 |
| Order Adopting R & R | 57 | 196-211 |
| PSR | N/A | N/A |
| Redacted J. | 84 | 549-554 |
| Notice of Appeal | 85 | 555 |
| SEALED Sentencing Hr'g Tr. | 87 | 556-600 |

Respectfully submitted,

*/s/* Needum L. Germany
Needum L. Germany
Assistant Federal Defender
200 Jefferson, Suite 200
Memphis, Tennessee 38103
(901) 544-3895

## <u>CERTIFICATE OF SERVICE</u>

I, Needum L. Germany, hereby certify that a copy of the foregoing brief was forwarded via the electronic filing system to Debra L. Ireland, Assistant United States Attorney, 8th Floor, Federal Building, 167 North Main Street, Memphis, Tennessee, 38103;

This, the <u>29th</u> day of November, 2016.

<u>/s/</u> Needum L. Germany
Needum L. Germany
Assistant Federal Defender